**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| *v.* | |
| **ROBERT JACKSON** | **NO. 24-400-KSM-1** |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                              **April 22, 2025**

Defendant Robert Jackson has been charged with possession of a firearm and ammunition after previously being convicted of a crime punishable by more than a year imprisonment, in violation of 18 U.S.C. § 922(g)(1).  (Doc. No. 1.)  He now moves to suppress the firearm and ammunition on which the charge is based, arguing that this evidence was obtained through an illegal seizure.  (Doc. No. 18.)

The Court held an evidentiary hearing on Defendant's motion to suppress on April 9, 2025.  (*See* Doc. No. 30.)  During the hearing, Philadelphia Police Department Officer Grace Oyana testified on behalf of the Government.  The Government also introduced Officer Oyana's body camera footage of the investigatory stop involving Defendant (Gov't Hr'g Ex. 1), a screenshot from the body camera footage depicting the three individuals involved in the stop, including Defendant (Gov't Hr'g Exs. 4, 4A), and the patrol alert for the arrest warrant for Raheim Jackson that prompted the stop (Gov't Hr'g Ex. 3).  Defendant introduced the warrant for Raheim Jackson (Def.'s Hr'g Ex. 1) and the arrest memorandum for Raheim Jackson and Defendant (Def.'s H'rg Ex. 2).

For the reasons discussed below, the Court denies Defendant's motion.

## I.     FACTUAL BACKGROUND

On April 16, 2024, Officer Oyana and his partner, Officer Pedro Ramos, were on duty in the tactical unit in the 25th District.[1]  (Hr'g Tr. 15:5–7, 16:5–17.)  That morning, Officers Hyk and Lane[2] showed Officer Oyana a patrol alert for an active arrest warrant for Raheim Jackson, which included his photograph, date of birth, and an address.  (*Id.* 17:18–25, 18:22–19:25; *see* Gov't Hr'g Ex. 3.)  They asked Officer Oyana whether he recognized the man pictured in the patrol alert, and Officer Oyana confirmed that the man in the photograph looked like someone whom he had previously encountered at least once in the area of 9th and Butler Streets.  (*Id.* 17:18–18:21, 20:14–25, 76:15–77:13.)  During the prior interaction(s), Officer Oyana had not requested identification from or otherwise learned the name of the person who looked like the man depicted in the patrol alert.  (*Id.*, *id.* 21:10–24:16.)

Shortly after 3:00 p.m. that day, while Officers Hyk and Lane were on patrol in plain clothes, they contacted Officers Oyana and Ramos to notify them that an individual who matched the description of the suspect in the patrol alert was in the area of 9th and Butler Streets.[3]  (*Id.* 16:18–17:2, 24:22–25:6.)  Officers Hyk and Lane described the individual's clothing and location, including that he was standing outside of a Jeep stopped at the intersection

---

[1] The 25th District is in Northeast Philadelphia, bordered by Roosevelt Boulevard, Lehigh Avenue, Broad Street, G Street, Allegheny Avenue, and Front Street.  (*See* Apr. 9, 2025 Rough Hr'g Tr. ("Hr'g Tr.") 15:21–16:4.)  The tactical unit focuses on investigating and targeting suspects of violent crimes, like robberies and shootings.  (*Id.* 14:15–25.)  On April 16, 2024, Officers Oyana and Ramos were in uniform and assigned to a marked patrol vehicle.  (*Id.* 16:14–17.)

[2] Neither the evidence introduced at the April 9 hearing nor the parties' briefing identifies Officers Hyk and Lane by their first names.

[3] Officer Oyana could not recall—and the paperwork related to the stop at issue and subsequent arrests of Defendant and Raheim Jackson did not reflect—whether Officers Hyk and Lane contacted them via police radio, Officer Oyana's department-issued cell phone, or his personal cell phone.  (*Id.* 63:14–64:1.)

of Percy and Butler Streets.[4]  (*Id.* 26:6–16, 28:21–25; Def.'s Hr'g Ex. 2 at 1.)  Officers Oyana and Ramos then drove to that area in their marked patrol vehicle, and during their drive, they reviewed the patrol alert for Raheim Jackson, which Officer Oyana had on his cell phone.  (Hr'g Tr. 25:7–26:5.)

Approximately five to ten minutes after receiving the call, Officers Oyana and Ramos arrived at the intersection of Percy and Butler Streets, where they observed two males standing outside of a parked silver Jeep and a third male sitting in the Jeep's driver's seat.  (*Id.* 26:14–24, 27:19–23; *see* Gov't Hr'g Ex. 4A.)  All three men were heavyset, African American men with short hair and beards.  (Hr'g Tr. 64:23–65:15; *see* Gov't Hr'g Ex. 4A.)  The Officers saw that two of the men looked very similar to each other and to the subject of the patrol alert—the man standing outside of the Jeep wearing sunglasses and a baseball hat, who was later identified as Defendant, and the man sitting inside of the Jeep, who was later identified as Raheim Jackson, Defendant's brother and the subject of the warrant.  (Hr'g Tr. 26:14–24; *see* Gov't Hr'g Exs. 3, 4A.)  Defendant and Raheim appeared to be roughly the same age and had similar statures, body types, facial features, and skin tones—so much so that the Officers thought they might be twins. (Hr'g Tr. 26:3–24, 33:3–11; *see* Gov't Hr'g Ex. 4A.)  And, upon seeing Defendant and Raheim together, it was not clear to Officer Oyana which man he had previously encountered that caused him to believe he recognized the subject of the patrol alert earlier that day.  (Hr'g Tr. 33:12–25.) So, as the Officers exited their vehicle and approached the Jeep, they believed that the subject of the warrant was either the man wearing sunglasses and a baseball hat standing outside of the jeep (Defendant) or the man sitting inside of the Jeep (Raheim).  (*Id.* 38:16–39:12.)

---

[4] Officer Oyana could not recall—and the related police paperwork did not reflect—the specific clothing description that Officers Hyk and Lane provided.  (*Id.* 64:12–67:23; *see* Def.'s Hr'g Ex. 2 at 1.) Nor did the paperwork reflect that Officers Hyk and Lane stated that the individual was standing outside of the Jeep.  (*See* Def.'s Hr'g Ex. 2 at 1.)

After walking over to the Jeep, Officer Oyana gave Defendant a "security touch"[5] on his elbow and asked him for identification.  (Gov't Hr'g Ex. 1 at 19:08:10–19:08:38; Hr'g Tr. 40:1–12.)  Defendant responded, "For what?," to which Officer Oyana replied that the Officers were "looking for somebody with a warrant, I just want to make sure you're not that person."  (Gov't Hr'g Ex. 1 at 19:08:10–19:08:38.)  Officer Oyana again asked Defendant for identification, and Defendant responded that he did not have any on him.  (*Id.*)  Officer Oyana asked whether Defendant had a picture of his identification on his phone, and Defendant turned to Raheim inside the car and asked, "Ra, do you?" before beginning to look through his phone.  (*Id.*)

Officer Ramos then asked the man sitting inside the Jeep, Raheim, for identification. (*Id.*)  Officer Oyana commented that Raheim and Defendant look "just alike" and asked if they are brothers, and Defendant confirmed that they are.  (*Id.*)  Officer Oyana responded, "that would explain that" and then asked Raheim for identification.  (*Id.*)  Raheim provided some form of identification—either a state identification card or a driver's license—to Officer Ramos, who immediately passed it to Officer Oyana.[6]  (*Id.* at 19:08:39–19:08:43; Hr'g Tr. 34:18–23.)  Officer Oyana then looked at the identification and compared it to the patrol alert on his phone for approximately 20 seconds, during which he only saw that the name on the identification matched the name on the patrol alert.  (Gov't Hr'g Ex. 1 at 19:08:43–19:09:04; Hr'g Tr. 48:20–49:5, 85:9–13, 87:6–21.)

While Officer Oyana was reviewing Raheim's identification, both Raheim and Defendant asked the Officers what the warrant was for.  (Gov't Hr'g Ex. 1 at 19:08:43–19:08:55.)  At the

---

[5] According to Officer Oyana, a security touch is a safety precaution that police officers are taught to use to gauge the body language of the person(s) involved in the interaction with the officers and determine how to approach the interaction accordingly.  (Hr'g Tr. 40:1–41:3.)

[6] The Government did not introduce a copy of Raheim's identification.

same time, the third man at the scene, who was standing outside of the Jeep along with Defendant, asked Officer Oyana if he was free to leave. (*Id.*; Hr'g Tr. 48:1–14.) Officer Oyana responded, "Yeah, you're good," after which the man walked away from the Jeep. (*Id.*) As Officer Oyana explained, this third male "didn't look like the person we were looking for. [Defendant and Raheim] both looked like the person we were looking for. There is no reason to stop a third person who doesn't look like the person that we are looking for." (Hr'g Tr. 48:9–14.)

Raheim and Defendant again asked the Officers what the warrant was for. (Gov't Hr'g Ex. 1 at 19:09:00–19:09:11.) Noticing a change in Raheim's tone of voice, Officer Oyana replied, "Yeah, so I'll tell you in a second, I'll just have you step out real quick." (*Id.*; Hr'g Tr. 50:23–51:16, 86:19–87:1.) Officer Oyana added, "If I'm gonna tell you, I'm just gonna have you step out. Cause last time somebody took off in a car and I ain't trying to chase everybody and all that crazy." (*Id.*) Officer Ramos then put his hand on the driver-side door handle of the Jeep, to which Raheim reacted by stating, "If I'm not under arrest, you can't unlock my door." (*Id.* at 19:09:11–19:09:17.) Officer Oyana replied, "Well, no, you're currently being detained." (*Id.*)

While Officer Oyana was directing Raheim to get out of his vehicle, Defendant handed Officer Oyana his phone, presumably having found a picture of his identification on his phone. (*Id.* at 19:09:11–19:09:17.) Approximately six seconds later, while Officer Oyana was still speaking to Raheim and Officer Ramos was attempting to unlock the driver-side door of the Jeep, and before Officer Oyana could review the content on Defendant's phone, Defendant ran away from the Officers while grabbing at his pockets.[7] (*Id.* at 19:09:11–19:09:25; Hr'g Tr.

---

[7] As Defendant fled, Officers Hyk and Lane can be seen exiting their unmarked vehicle a short distance away from the Jeep. (Gov't Hr'g Ex. 1 at 19:09:16–19:09:22.)

50:14–52:3; Def.'s Hr'g Ex. 2 at 1.)  Officer Ramos immediately chased after Defendant on foot,

while Officer Oyana remained by the Jeep with Raheim. (*Id.*)  Beginning when Officer Oyana

touched Defendant's elbow and asked for his identification, Defendant's total interaction with

the Officers prior to fleeing the scene lasted approximately 61 seconds.  (Gov't Hr'g Ex. 1 at

19:08:16–19:09:17; *see* Hr'g Tr. 92:4–7.)

     When he fled, Defendant ran into an alley behind North Percy Street, and Officer Ramos

observed Defendant reach into and retrieve a black object from his pocket and then throw that

object into a rear yard along the alley.  (Def.'s Hr'g Ex. 2 at 2.)  Defendant was ultimately

stopped and detained, after which Officer Ramos returned to the rear yard where he had observed

Defendant discard a black object, and he recovered a black Taurus, model G3C, 9mm semi-

automatic pistol, loaded with ten rounds of ammunition.  (*Id.*)

     According to Officer Oyana, he subsequently verified that the man inside the Jeep was

Raheim Jackson by providing Raheim's identification to Officer Hyk, who then ran the

information through dispatch, and by asking Raheim for his name.[8]  (Hr'g Tr. 52:25–54:4; Gov't

Hr'g Ex. 1 at 19:13:20–19:13:25; *see* Def.'s Hr'g Ex. 2 at 2.)  And Defendant's identity was

subsequently confirmed through a computerized database of criminal information.  (*See* Def.'s

Hr'g Ex. 2 at 2.)

     After Defendant was charged locally, his case was adopted federally on October 31,

2024, when he was indicted by a federal grand jury sitting in this District and charged with

possession of a firearm and ammunition after previously being convicted of a crime punishable

by more than a year imprisonment, in violation of 18 U.S.C. § 922(g)(1).

---

[8] Officer Oyana also appeared to later run a computerized check of Raheim's identification while
he and Officer Ramos were transporting Raheim and Defendant in their patrol vehicle.  (*See* Gov't Hr'g
Ex. 1 at 19:27:45–19:28:32.)

II.      **THE PARTIES' ARGUMENTS**

Defendant now moves to suppress the firearm and ammunition he discarded when he fled the scene of the stop on two grounds.  First, he argues that his initial seizure was not justified by reasonable suspicion.  (Hr'g Tr. 12:9–21, 101:23–105:24.)  Second, he asserts that even if the initial seizure was lawful, the Officers no longer had reasonable suspicion to detain him once his brother, Raheim, provided his identification to the Officers, which enabled the Officers to determine that Raheim was the subject of the active warrant.  (*See generally* Doc. No. 18.)  Defendant contends that after that point, the Officers unlawfully detained him.  (Doc. No. 18 at 9–13.)  Because he alleges that he was unlawfully detained when he fled and ultimately discarded his firearm, Defendant asserts that the recovered firearm and ammunition must be suppressed as fruit of the unlawful seizure.  (*Id.* at 13–14.)

In response, the Government argues that the Officers maintained reasonable suspicion throughout their entire detention of Defendant because they were unable to confirm whether Defendant or Raheim was the subject of the warrant before Defendant fled the scene.  (*See generally* Doc. No. 22.)  Thus, the Government reasons, Defendant's abandonment of his firearm upon fleeing occurred as part of the Officers' lawful seizure of Defendant.  (*Id.* at 10–16.)  Alternatively, if the Court finds that reasonable suspicion to detain Defendant dissipated after the Officers obtained and reviewed Raheim's identification, the Government argues that the Officers did not exhibit the kind of deliberate, reckless, or grossly negligent conduct that would justify suppression of the firearm and ammunition.  (*Id.* at 16–17.)

III.     **LEGAL STANDARD**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

To invoke this protection, a defendant challenging a search or seizure through a motion to suppress bears the burden of establishing that his Fourth Amendment rights were violated. *See United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011); *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *see also United States v. Cole*, 425 F. Supp. 3d 468, 484 (W.D. Pa. 2019) ("The defendant's burden is easily satisfied when law enforcement conducted the challenged search or seizure without a warrant."). The Government must satisfy its burden of proof by a preponderance of the evidence. *See United States v. Bey*, 911 F.3d 139, 145 (3d Cir. 2018).

## IV.      DISCUSSION

"Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)). It is well-settled, however, that "under the exception to the warrant requirement established in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968), 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "Any evidence obtained pursuant to an investigatory stop . . . that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

As explained below, the Court concludes that the Officers lawfully detained Defendant based on the reasonable suspicion that he was the subject of an active arrest warrant, and that reasonable suspicion did not dissipate before Defendant fled from the Officers and discarded a loaded firearm.  Accordingly, the Court denies Defendant's motion to suppress that firearm and ammunition as fruit of an unlawful seizure.

### A.    Defendant was seized when Officer Oyana placed his hand on Defendant's arm and asked for Defendant's identification.

Because "there can be no Fourth Amendment violation until a seizure occurs," the Court must first determine whether and when Defendant was seized within the meaning of the Fourth Amendment.  *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000); *see Brown*, 448 F.3d at 245 ("We begin by determining when the seizure of Brown occurred, as that is the moment 'the Fourth Amendment becomes relevant.'" (quoting *Terry*, 392 U.S. at 16)).  "A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" *Brown*, 448 F.3d at 245 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

The Court agrees with the parties that Defendant's seizure occurred when Officer Oyana placed his hand on Defendant's arm and asked Defendant for his identification.  (*See* Doc. No. 18 at 9; Doc. No. 22 at 8–9.)  These words and actions, coupled with Officer Oyana's subsequent explanation that the Officers were "looking for somebody with a warrant," would have conveyed to a reasonable person that "he was being ordered to restrict his movement."  *See Brown*, 448 F.3d at 245–46 ("[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." (quoting *Hodari D.*, 499 U.S. at 628)).  And Defendant submitted to Officer Oyana's "show of authority" by

remaining at the scene and reviewing his phone for a picture of his identification to provide to the Officers. *See Brown*, 448 F.3d at 246. Accordingly, we consider whether the Officers had reasonable suspicion to seize Defendant when Officer Oyana put his hand on Defendant's arm and asked Defendant to provide identification.

> ## B.    Defendant's seizure was based on reasonable suspicion.

"Reasonable suspicion is an 'elusive concept,' but it unequivocally demands that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Brown*, 448 F.3d at 246 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "[E]ach aspect of the detention must be justified by a reasonable suspicion." *Bey*, 911 F.3d at 145. In assessing whether reasonable suspicion exists, this Court must consider the totality of the circumstances (i.e., the whole picture). *See, e.g.*, *United States v. Goode*, 486 F. App'x 261, 264 (3d Cir. 2012); *United States v. Colen*, 482 F. App'x 710, 712 (3d Cir. 2012). As the Third Circuit has recognized, "[c]ourts give considerable deference to police officers' determinations of reasonable suspicion." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006); *see Bey*, 911 F.3d at 145 (determining whether police had reasonable suspicion based on the totality of the circumstances "requires us to credit reasonable deductions drawn by police in light of their experience and training").

While Defendant initially "assume[d] without conceding" that, "[g]iven their similarity in appearance," the police had reasonable suspicion to detain Defendant "for long enough to determine he was not Raheim Jackson, the subject of the active arrest warrant" (Doc. No. 18 at 3 n.1), Defendant withdrew that assumption at the evidentiary hearing (Hr'g Tr. 12:9–21). Instead, Defendant argues that the Government failed to establish that reasonable suspicion justified Defendant's initial seizure. (Hr'g Tr. 12:9–21.) In support of his argument, Defendant points to Officer Oyana's testimony that, on at least one prior occasion, he had interacted with someone

who looked like the subject of the warrant, and that Officers Hyk and Lane apparently recognized the subject of the warrant as someone who frequented the area of 9th and Butler Streets. (*See* Hr'g Tr. 17:18–18:21, 20:14–25, 67:24–69:18, 76:15–77:6; Def.'s Hr'g Ex. 2 at 1.) Defendant also points to the nature of the information—i.e., location and clothing description— that Officers Hyk and Lane provided to Officers Oyana and Ramos when they relayed that a man who appeared to match the subject of the warrant was in the area of 9th and Butler Streets. Officer Oyana recalled that Officers Hyk and Lane had described the man as standing outside of the Jeep—a fact that is not included in any of the paperwork associated with the stop and subsequent arrest of Defendant and Raheim. (Hr'g Tr. 64:12–67:23.) But Officer Oyana could not recall—and the paperwork does not specify—the information about the suspect's clothing that was conveyed to him, and Defendant and Raheim were wearing different clothing during the stop. (*Id.* 64:12–67:23, 79:4–80:7.) Considering the collective knowledge of the Officers involved based on these facts, Defendant contends that the Government has not met its burden to show that the Officers had reasonable suspicion to initially stop Defendant to determine whether he was the subject of the warrant. (*See id.* 101:23–105:24.) The Court disagrees.

Belief that an individual matches the description of an active arrest warrant establishes reasonable suspicion to justify an investigatory stop of that individual. *See, e.g.*, *United States v. Fields*, 176 F. App'x 327, 329–30 (3d Cir. 2006) (finding that officer's personal knowledge of an active bench warrant for an individual and recognition of that individual as a passenger in a car while on patrol established reasonable suspicion for the officer's traffic stop of the car); *United States v. Dawkins*, No. 09-cr-163, 2009 WL 3350451, at *3 (W.D. Pa. Oct. 15, 2009), *aff'd*, 419 F. App'x 224 (3d Cir. 2011) (holding that the stop of the vehicle driven by defendant was "clearly permissible" because the officers had a copy of an arrest warrant for a passenger in the

vehicle and were familiar with that passenger at the time they identified him as the subject of the warrant and stopped the vehicle); *United States v. Barr*, 454 F. Supp. 2d 229, 253 & n.41 (E.D. Pa. 2006), *aff'd*, 349 F. App'x 704 (3d Cir. 2009) (finding that officer performed a lawful traffic stop of defendant's vehicle based on his recognition of defendant and his knowledge that defendant was wanted on an active arrest warrant); *see also United States v. Rosario*, 305 F. App'x 882, 885 (3d Cir. 2009) (holding that officer's belief that a valid arrest warrant existed for defendant under an alias, that defendant used the alias listed as the name in the warrant, and that defendant was the person in the vehicle "alone was sufficient to establish probable cause to support the directed stop of [defendant's] vehicle").

Here, the Government established that on the afternoon of April 16, 2024, Officers Hyk and Lane informed Officers Oyana and Ramos that a man who matched the appearance of the subject of an active warrant was in the area of 9th and Butler Streets.  (Hr'g Tr. 16:18–17:2, 24:22–25:6., 26:6–16, 28:21–25; Def.'s Hr'g Ex. 2 at 1.)  Earlier that day, Officer Oyana had recognized the man pictured in the patrol alert as someone he had previously seen in the area but whose name and identification he had never verified.  (Hr'g Tr. 17:18–18:21, 20:14–25, 21:10– 24:16.)  As Officers Oyana and Ramos approached the scene at the intersection of Percy and Butler Streets, they observed two men who looked like each other and both looked like the subject of the warrant as depicted in the patrol alert.  (*Id.* 26:14–24, 27:19–23, 33:3–25, 38:16– 39:12; *see* Gov't Hr'g Exs. 3, 4A.)  Officer Oyana was unable to determine which of the two men he had previously encountered.  (*Id.*)  Regardless of what information Officers Hyk and Lane provided about the clothing and location of the individual who they believed matched the patrol alert, when Officers Oyana and Ramos arrived at the scene, they encountered two men with such similar body structures, facial features, and skin tones that "it [was] not clear which of

the two gentlemen have the warrant because they look the same." (*See* Hr'g Tr. 33:3–11; Gov't Hr'g Exs. 3, 4A.) Under these circumstances, the Court finds that a reasonable, trained officer standing in the shoes of Officers Oyana and Ramos had reasonable suspicion to seize Defendant to determine whether he was the subject of an active warrant. *See Brown*, 448 F.3d at 246–47 ("The ultimate question is whether a reasonable, trained officer standing in [the officer's] shoes could articulate specific reasons justifying [the] detention." (quoting *Johnson*, 332 F.3d at 206)).

### C. The reasonable suspicion justifying Defendant's seizure had not dissipated when Defendant fled from the Officers and discarded a loaded firearm.

An investigative stop under *Terry* "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Bey*, 911 F.3d at 147 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). "Once reasonable suspicion has been dispelled, even a very brief extension of detention without consent or reasonable suspicion violates the Fourth Amendment. An investigative stop must therefore cease once reasonable suspicion dissipates." *Id.* (internal quotations omitted). The Government has the burden of demonstrating "that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope *and duration* to satisfy the conditions of an investigative seizure." *Id.* (quoting *Royer*, 460 U.S. at 500).

The crux of the parties' disagreement is whether the Officers unlawfully extended Defendant's seizure after Raheim, Defendant's brother and the subject of the active warrant, provided his identification to the Officers, such that the reasonable suspicion justifying Defendant's seizure had been dispelled by the time Defendant fled. (*See* Doc. No. 18 at 9–13; Doc. No. 22 at 10–16.) Defendant claims that the Officers no longer had reasonable suspicion to detain Defendant once Raheim provided his identification and Officer Oyana compared it to the individual pictured on the patrol alert. (Doc. No. 18 at 12.) Officer Oyana spent approximately 20 seconds comparing the photographs and then immediately told Raheim he needed to step out

of his vehicle as he was being detained. (*Id.*) But the Government contends that despite this direction to Raheim, the Officers had not accomplished the purpose of the stop—to confirm whether Raheim or Defendant was the subject of the warrant—at that point or before Defendant fled and discarded a loaded firearm. (Doc. No. 22 at 11–14.) The Government argues that the Officers were unable to take the necessary steps to verify Raheim's identity in the approximately 34 seconds between when Raheim provided his identification to the Officers and when Defendant fled. (*Id.*) During these 34 seconds, the Officers were simultaneously communicating with Raheim and Defendant about the warrant, attempting to get Raheim out of the Jeep, and being handed Defendant's cell phone. (*Id.*)

The Court finds that these 34 seconds were not sufficient for the Officers to complete the mission of their stop—to identify the subject of the warrant—when Defendant fled. Accordingly, Defendant was still under a lawful seizure supported by reasonable suspicion when he discarded a loaded firearm while fleeing from the scene of the stop.

Relying on *Bey* and *Davila v. Northern Regional Joint Police Board*, 370 F. Supp. 3d 498 (W.D. Pa. 2019), Defendant contends that the Officers "learned objective facts," i.e., verification of Raheim's identity, when they received Raheim's identification and momentarily cross-checked that identification with the patrol alert, which "negated their earlier reasonable suspicion" that Defendant—as opposed to Raheim—could have been the subject of the warrant. (Doc. No. 18 at 10–12.) But Defendant's reliance on these cases is misplaced. Moreover, as the Government argues, both cases support the conclusion that the Officers did not accomplish the mission of their stop—and thus their reasonable suspicion had not dispelled—when Officer Oyana briefly compared Raheim's identification to the patrol alert.

First, unlike in *Bey*, there were no obvious discrepancies between the depiction of the

subject of the warrant in the patrol alert and the actual appearances of both Defendant and

Raheim such that reasonable suspicion for detaining Defendant immediately dissipated once

Officer Oyana compared Raheim's identification with the patrol alert.  In *Bey*, the Third Circuit

held that the reasonable suspicion justifying the initial stop of the defendant dissipated as soon as

he turned around to face the officers, at which point the officers "had a good look at him" and

"should have noticed the clear differences in appearance and age" between the defendant and the

individual for whom the officers were looking when they stopped the defendant.  911 F.3d at

147, 149.  The evidence proffered by the Government revealed that the "differences between the

two men"—i.e., different skin color, facial hair, size, and age—"are as obvious as they are

significant," which led the court to find that the Government failed to meet its burden to prove

that the defendant sufficiently resembled the wanted individual to justify the defendant's

continued detention.  *Id.* at 148.

 In contrast, here the Government introduced evidence that Defendant and Raheim

appeared to be close in age and have similar skin tones, facial features, including facial hair, and

body structures, as compared both to each other and to the subject of the warrant.  (Hr'g Tr.

26:3–24, 33:3–11; Gov't Hr'g Exs. 1, 3, 4A.)  And Defendant concedes that "these gentlemen

look a lot alike, they are brothers a year apart."  (Hr'g Tr. 12:15–18.)  This is not a situation in

which Defendant and the subject of the warrant "simply do not look alike," and there were no

reasonably apparent material differences between Raheim (as he appeared in person or in his

identification), Defendant, and the subject of the warrant.[9]  *See Bey*, 911 F.3d at 149; *see United

States v. Brown*, 448 F.3d 239, 248 (3d Cir. 2006) (finding that the police radio description of

---

[9] Though the Officers did encounter such a situation with respect to the third man at the scene of
the stop, and the Officers allowed him to leave without producing any identification based on their
determination that he clearly did not resemble the subject of the warrant.  (*See* Hr'g Tr. 48:1–14.)

two robbery suspects was so "wildly wide of target" when compared to the individuals whom the police stopped that "[b]y no logic does it, by itself, support reasonable suspicion" for the stop of those individuals, where "about the only thing [the stopped individuals] had in common with the suspects was that they were black").  Here, the Government has met its burden to prove that both Defendant and his brother, Raheim, sufficiently resembled each other and the individual pictured in the patrol alert to justify the continued seizure of Defendant after Raheim produced his identification.

Next, the stop in *Davila* is distinguishable from the stop at issue here because, unlike the officer in *Davila*, Officers Oyana and Ramos did not have an opportunity to objectively confirm that Raheim's identification was both valid and linked to a current warrant or take additional steps to verify the identities of Raheim and Defendant that were reasonably necessary under the circumstances.  In *Davila*, while conducting a routine traffic stop of a vehicle that was driving at night without its headlights on, an officer requested the driver's license, vehicle registration, and proof of insurance, all of which the driver provided.  370 F. Supp. 3d at 508.  The officer then asked the county dispatch to verify this information, and dispatch confirmed that the driver's license, registration, and insurance were valid and up to date approximately 29 minutes after the officer initiated the stop.  *Id.* at 508–09.  The Court found that "any doubts as to [the driver's] identity were dispelled once [dispatch] confirmed that her driver's license was valid."  *Id.* at 520.  At that point, "[h]er seizure for the investigation of the headlight violation should have gone on no longer," but the officer unlawfully prolonged the traffic stop to investigate the driver's immigration status without reasonable suspicion.  *Id.* at 520–21.

Here, the Officers were not able to confirm through any objective means that the form of identification provided by Raheim was valid and that he was in fact the subject of the active

warrant.  Verification of the identity of an individual subject to an investigatory stop constitutes

an "ordinary inquir[y]" related to the mission of the stop.  *See Rodriguez v. United States*, 575

U.S. 348, 354–55 (2015) ("Like a *Terry* stop, the tolerable duration of police inquiries in the

traffic-stop context is determined by the seizure's 'mission'" . . . .  Beyond determining whether

to issue a traffic ticket, an officer's mission includes inquiries incident to the traffic stop.

Typically such inquiries involve checking the driver's license[.]" (internal quotations and

citations omitted)); *United States v. Hurtt*, 31 F.4th 152, 160 (3d Cir. 2022) ("Determining the

'relatedness' of any given action to the basic mission of investigating a traffic violation requires

assessing whether the action was something ordinarily incident to a traffic stop.  Such actions

normally include 'checking the driver's license[.]'" (quoting *Rodriguez*, 575 U.S. at 355)).  Like

*Davila*, the case law contemplates the use of an objective means of identity verification to

accomplish the mission of an investigatory stop and, at the very least, suggests that an officer's

20-second subjective review of an identification card is insufficient to accurately verify the

identity of the individual who proffered that identification and confirm a current warrant

associated with that identification.  *See United States v. Clark*, 902 F.3d 404, 406, 411 (3d Cir.

2018) (holding that a traffic stop was completed after the officer's "computerized check" of the

driver's license and the vehicle's license plate number, such that the officer's subsequent

questioning of the passenger in the vehicle regarding his criminal history "went beyond ordinary

inquiries incident to the traffic stop" (internal quotations omitted)); *United States v. Jocktane*,

No. 19-cr-228, 2021 WL 6616728, at *8 (M.D. Pa. May 21, 2021), *report and recommendation*

*adopted*, 2022 WL 175335 (M.D. Pa. Jan. 19, 2022) (holding that the duration of a traffic stop

was no longer than reasonably necessary for the officers to run "records and identification

checks" on the individuals in the vehicle, given that the stop was precipitated by a 9-1-1 call

reporting a suspicious vehicle parked in the same location as the vehicle stopped and that the individuals in the vehicle informed the officers that the vehicle did not belong to any of them); *United States v. Vick*, No. 19-cr-216, 2021 WL 1812684, at *5–6 (M.D. Pa. May 6, 2021) ("[T]he *Rodriguez* moment," i.e., when a traffic stop is extended beyond its original mission, "occurred upon the completion of running [the driver's] license through county control, which was the last task incident to the purpose of the traffic stop."); *see also United States v. Hunter*, 88 F.4th 221, 225 (3d Cir. 2023) ("[T]he Government concedes that [the officer] had completed the tasks specifically tied to the traffic stop when he finished the computerized N.C.I.C. driver's license and warrant checks [of the two occupants of the vehicle]." (internal quotations omitted)).

Indeed, Officer Oyana testified that in situations where he stops an individual on suspicion of an active warrant, he typically takes several steps to identify the individual as the subject of the warrant, including: requesting a form of identification; confirming that identification belongs to the individual who produced it by, for example, asking the individual to provide certain detailed information from the identification, such as zip code, height, or last four digits of their social security number;[10] and running the information from the identification through either dispatch or his own computer system to confirm the validity of the identification form and any warrant associated with that identified individual. (Hr'g Tr. 41:21–45:24.)

Even if the Officers had objectively confirmed that Raheim's identification was valid and associated with an active warrant, the circumstances of the stop at issue here—i.e., that the Officers intended to execute an arrest warrant and encountered Raheim and Defendant, who,

---

[10] Officer Oyana testified that in his experience, it is necessary to "make sure the person on the ID is the person you are talking to" because he has encountered at least one scenario in which a stopped individual provided an identification that was not his and, in fact, belonged to this individual's brother. (Hr'g Tr. 41:21–43:22, 45:5–24.)

given their similarities in appearance, both seemingly matched the description of the subject of the warrant—were such that the Officers reasonably needed to take additional steps to dispel any doubts as to the identity of the subject of the warrant. *See Hurtt*, 31 F.4th at 159 ("When reviewing an allegation that [an investigatory] stop started out properly but later was improperly extended, we 'look to the facts and circumstances confronting the officer to determine whether his or her actions during the stop were reasonable.'" (quoting *Clark*, 902 F.3d at 409) (cleaned up)). As the Government argues, these additional steps included verifying that Raheim was the individual depicted in the identification he provided by verifying Defendant's identity in order to distinguish between Raheim and Defendant and confirm that Raheim was the individual pictured in the patrol alert and thus the subject of the warrant—none of which the Officers could take in the 13 seconds following the conclusion of Officer Oyana's review of Raheim's identification before Defendant fled, at which point both Officers were focused on getting Raheim out of the Jeep.[11] *See United States v. Mitra-Hernandez*, No. 20-1175, 2022 WL 205419, at *2 (3d Cir. Jan. 24, 2022) (holding that the reasonable suspicion justifying the traffic stop of defendant to determine whether he was the individual whom the officers suspected of illegal reentry did not dissipate when defendant provided his Mexican identification card to the officers, which listed a name that differed from the name of the suspect, and the officers "acted reasonably when they sought to confirm [defendant's] identity" by asking additional questions about defendant's

---

[11] Although there appears to be no dispute as to the reasonableness of the Officers' attempts to get Raheim to exit the Jeep, the Court finds that the Officers did not unlawfully extend the stop by forcing Raheim to exit the Jeep as a safety precaution before taking any additional steps to verify the identities of Defendant and Raheim. *See Hurtt*, 31 F.4th at 160 ("When evaluating whether an officer was on-mission, we consider the 'legitimate and weighty interest in officer safety' and thus will tolerate additional intrusions, such as forcing a driver to get out of a vehicle." (quoting *Rodriguez*, 575 U.S. at 356)); *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) ("Under *Mimms*, the officer may order the driver out of the vehicle without any particularized suspicion." (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977))).

birthplace, citizenship, and history of deportation and reentry); *cf. Hunter*, 88 F.4th at 225–26 (holding that officer's criminal record check of driver subjected to traffic stop, following officer's license and warrant check of both the driver and passenger, while not "a routine task tied to the traffic infraction," constituted a "negligibly burdensome officer safety precaution that falls squarely within the confines of the stop's mission"); *United States v. Morris*, No. 20-cr-263, 2023 WL 5607970, at *8 (W.D. Pa. Aug. 30, 2023) ("The totality of the circumstances presented herein, where the traffic stop was initiated in the middle of the night, where [the officer] was outnumbered by the occupants of the [vehicle] three to one, and where the driver of the [vehicle] was unable to produce the appropriate registration for the vehicle or proof of insurance, support a finding that [the officer's] minimally invasive request for the [vehicle's] passengers' identification was supported by legitimate officer safety rationale[,]" such that the officer's "actions neither deviated from the mission of the traffic stop nor measurably extended the stop.").  It is also critical to note that Defendant ran away from the Officers only *six seconds* after he handed Officer Oyana his phone.  During those six seconds, Officer Oyana did not have the opportunity to so much as glance at what was pictured on the phone because as Defendant handed it to him, he and Officer Ramos were in the midst of responding to Raheim's rapidly increasing resistance to exiting the Jeep.[12]

     This stop was an approximately 61-second interaction that involved several moving parts and quickly escalated, particularly in the 13 seconds between Officer Oyana concluding his comparison of Raheim's identification to the patrol alert and Defendant fleeing the scene.  Based

---

[12] This would have been a very different scenario had Defendant remained at the scene until the Officers successfully removed Raheim from the Jeep—which, based on Officer Oyana's body camera footage, might have taken only about 30 more seconds (*see* Gov't Hr'g Ex. 1 at 19:09:20–19:09:50)—and had an opportunity to even briefly review Defendant's identification that was presumably pictured on the phone he handed to Officer Oyana.

on the totality of the circumstances, the Officers had reasonable suspicion to continue to detain Defendant even after Officer Oyana briefly compared the identification provided by Raheim to the patrol alert because the purpose of the stop—to verify whether Raheim or Defendant was the subject of the warrant in order to execute the arrest—had not yet been effectuated.

***

Because Defendant was still subject to a lawful seizure supported by reasonable suspicion when he fled the scene of the stop and ultimately discarded a loaded firearm, suppression of that firearm and ammunition is not warranted.[13]

## V.    CONCLUSION

For the reasons set forth above, the Court denies Defendant's motion to suppress.  An appropriate Order follows.

---

[13] Because the Court holds that Defendant was not illegally seized at any point during the stop in question, the Court need not reach the Government's alternative argument that the exclusionary rule should not apply even if Defendant's Fourth Amendment rights were violated during the stop.  (*See* Doc. No. 22 at 16–17.)